## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**CHURCHILL DOWNS, INC.,**

**Plaintiff,**

v.

**NLR ENTERTAINMENT, LLC AND NICHOLAS L. RIBIS,**

**Defendants/Third-Party Plaintiffs,**

v.

**WILLIAM CARSTANJEN,**

**Third-Party Defendant.**

Civ. No. 14-3342 (KM) (MAH)

**OPINION**

### KEVIN MCNULTY, U.S.D.J.:

In 2013, the plaintiff, Churchill Downs, Inc. ("CDI"), and the defendants, NLR Entertainment, LLC ("NLR") and its principal, Nicholas L. Ribis, entered into an agreement. CDI was to provide online gambling services to the Showboat Atlantic City Hotel and Casino ("Showboat"), once NLR had purchased that casino. NLR never purchased the Showboat, CDI never supplied services, and each now accuses the other of breaching their agreement (among other things). CDI says that NLR breached when it failed to acquire Showboat—the whole foundation of the agreement. And Ribis, who knew that a deal for Showboat had not been or could not be reached, allegedly strung CDI along for months about the state of negotiations with Showboat's owner, Caesars Entertainment ("Caesars"). NLR and Ribis see things quite differently. The Showboat deal collapsed, they say, only because CDI refused to place $7.5 million in escrow, money that NLR needed in order to pay the $5 million deposit required under its purchase agreement with Caesars. Even

1

worse, complains Ribis, William Carstanjen, CDI's president and chief operating officer, defamed Ribis by calling him a "fraud" in statements to Caesars and others in the industry.

On October 5, 2015, I denied both Carstanjen's motion to dismiss the counterclaims of NLR and Ribis, and CDI's motion for judgment on the pleadings. (ECF No. 44 "Opinion") Writing "at some length to orient the parties' anticipated motions for summary judgment," I warned NLR and Ribis that their allegations "were factually quite thin" and that "far more will be required at the summary judgment stage." Now before the Court are those summary judgment motions: CDI moves for summary judgment on its breach of contract claim and against the counterclaims of NLR and Ribis for breach of contract, breach of the implied covenant of good faith and fair dealing, and defamation. Ribis and NLR move for summary judgment against CDI's fraud claim.

For the reasons expressed below, I will grant each of the summary judgment motions. There is no genuine issue of material fact that NLR breached the parties' agreement when it failed to acquire Showboat, and NLR has failed to factually substantiate any of its counterclaims, including defamation. But I will also grant NLR's motion for summary judgment on CDI's fraud claim, because CDI has failed to show that it was damaged by Ribis's conduct.

# I.    BACKGROUND

I write for the parties and so assume familiarity with my prior Opinion. I highlight here the facts pertinent to resolution of the parties' cross motions.

## A.    Term Sheet and License Agreement[1]

On August 3, 2013, CDI and Ribis (on behalf of NLR) signed a binding term sheet ("Term Sheet"). It outlined an agreement under which CDI would "host, manage, operate, and support" an online gaming and gambling system

---

[1]    Citations to the record will be abbreviated as follows:

"Def. Oppo. Br." — Defendants' Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment, ECF No. 66

"PSF" — Plaintiffs' Statement of Undisputed Material Facts, ECF No. 61-1

"DRSF" — Defendants' Reply to Plaintiff's Statement of Material Undisputed Facts, ECF No. 66-1

"DSSF" — Defendants' Supplement Statement of Material Undisputed Facts, ECF No. 66-1

"PRSSF" — Plaintiffs' Reply to Defendants' Response to Defendants' Statement of Material Undisputed Facts, ECF No. 67-1

"DSF" — Defendants' Statement of Material Undisputed Facts, ECF No. 62-5

"PRSF" — Plaintiffs' Reply to Defendant's Statement of Material Undisputed Facts, ECF No. 65-1

"PSSF" — Plaintiffs' Supplemental Statement of Material Undisputed Facts, ECF No. 65-2

"Pl. Ex. __" — Plaintiffs' Exhibits to the Certifications of Cathleen M. Devlin submitted in connection with Plaintiffs' Motion for Partial Summary Judgment, Opposition to Defendants' Motion for Partial Summary Judgment, and Reply in Further Support of Plaintiffs' Motion for Partial Summary Judgment, ECF Nos. 61-3, 65-3, and 67-2

"Def. Ex. __" — Defendants' Exhibits to the Certification of William O'Connor submitted in connection with Defendant's Motion for Partial Summary Judgment, ECF Nos. 62-1

"Def. Oppo. Ex. __" — Defendants' Exhibits to the Certification of William O'Connor submitted in connection with Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, ECF No. 66-3

"Def. Supp. Ex. __" — Defendants' Exhibits to the Supplemental Certification of William O'Connor in connection with Defendants' Reply in Further Support of Defendants' Motion for Partial Summary Judgment, ECF No. 68-1

"in connection with NLR's ownership of Showboat." According to the Term Sheet, NLR was obligated to enter into a definitive agreement to purchase Showboat by October 15, 2013, and to close on the purchase by January 31, 2014. By "definitive agreement," the parties meant an asset purchase agreement ("APA") or a purchase/sale agreement ("PSA"). For its part, CDI made an initial payment of $2.5 million to NLR, which was earmarked to be credited towards a $10 million rights fee. The remaining $7.5 million would be deposited "into an escrow account within one business day of the date NLR enters into a definitive agreement to purchase [] Showboat." If, however, NLR failed to acquire Showboat by January 31, 2014, then it would be required to "repay the $2.5 million dollars." (PSF ¶¶ 1-8, 14; DRSF ¶¶ 1-8, 14; Pl. Ex. D §§ 1.2, 1.3)

A month after signing the Term Sheet, on September 4, 2013, the parties entered into a comprehensive License and Operating Agreement (the "License Agreement"). For the purposes of this dispute, the parties' responsibilities under the License Agreement were virtually identical to those laid out in the Term Sheet. NLR was still obligated to "execute a definitive agreement to acquire Showboat by October 15, 2013." If NLR failed to do so, it would have to return CDI's initial $2.5 million payment "as liquidated damages." CDI, for its part, was obligated to deposit the balance of the rights fee—*i.e.*, $7.5 million—into an escrow account "[o]n the first Business Day following the date NLR enters into a definitive agreement to acquire Showboat." Having entered into such an agreement, NLR would then be required to "consummate the transactions contemplated thereby [*i.e.*, to acquire Showboat] by January 31, 201[4]." (PSF ¶¶ 8-16; DRSF ¶¶ 8-16; Pl. Ex. E §§ 3.i, 10.d.ii, 10.e.i)

That said, the License Agreement did add a few wrinkles. The License Agreement placed restrictions on the use of escrowed funds: if and when NLR entered into a definitive agreement and CDI deposited $7.5 million into escrow, NLR would only be "permitted to use $1,000,000 of [the $7.5 million in]

escrowed funds as a deposit" for the purchase of Showboat. CDI was now obligated to use best efforts to launch the online gaming system by April 2, 2014; if it failed to do so, it would incur $10,000 per day in liquidated damages. All future amendments to the License Agreement, the parties provided, must be in writing and signed by authorized representatives. (PSF ¶ 16; DRSF ¶ 16; DSSF ¶ 3; PRSSF ¶ 3; Pl. Ex., §§ 3.h, 10.d-e, 19.h)

Those changes aside, the License Agreement and the Term Sheet shared a central purpose: to effectuate "CDI and NLR['s] desire for CDI to be the exclusive vendor to Showboat of internet gaming and online gambling services after the consummation of NLR's acquisition of Showboat." (Pl. Ex. E p.1)

## B.   Early Performance and Proposed Amendment

On the same day that CDI entered into the License Agreement, it entered into a binding term sheet with iTeamGaming LLC, a software and software development support services company. Pursuant to that term sheet, CDI agreed to pay iTeamGaming over $10 million to assist in the development of Showboat's gaming system. CDI also hired 20-30 new engineers and leased additional office space in Louisville, Kentucky. On October 2, 2013, CDI and iTeamGaming executed a definitive Software and Development License Agreement (PSF ¶¶ 46-48; DRSF ¶¶ 46-48; Pl. Ex. Y; Def. Supp. Ex. A)

NLR and Ribis, meanwhile, encountered early obstacles in their negotiations with Caesars to purchase Showboat. NLR specifically objected to Caesars' attempt to retain electronic Showboat customer data, which it could have used to steer Showboat customers to Caesars' three other Atlantic City casinos. So important was this customer data, testified Ribis, that NLR "would have been out of business day two" if it had purchased Showboat on those terms. More generally, Ribis found Caesars to be "a difficult company to deal with . . . because [of] . . . their potential bankruptcy coming and their financial problems, and [because Ribis's counterpart at Caesars, Eric Hession] wasn't

really a decisionmaker." (PSF ¶¶ 24-25; DRSF ¶¶ 24-25; Pl. Ex. A 145:2-3, 198:25-199:14)

In deposition testimony, Ribis acknowledged that the customer data issue was not resolved "until later in November or early December [2013]."[2] On September 17, 2013, however, Ribis told Carstanjen that he "expect[ed] the final PSA today" and that NLR and Caesars would "sign[] probably tomorrow." About three weeks later, on October 9, 2013, Ribis told Carstanjen that he had "talked to C[aesars] we [a]r[e] complete." But Showboat did not actually enter a definitive agreement to buy Showboat at that (or any other) time. (Pl. Ex. A 145:6-13; PSF ¶ 23; DRSF ¶ 23; Pl. Exs. J, K)

October 15, 2013, was the deadline under the License Agreement for NLR to enter into a definitive agreement to purchase Showboat. That deadline came and went. "[I]t's now clear," Carstanjen wrote to Ribis on October 23, 2013, "that the closing may be delayed beyond your original expectations because of the technology and systems transitions issues." Since "having [CDI's] money sit in escrow for months when we present no credit risk is just an unwise allocation of capital," Carstanjen proposed (1) moving the April 2, 2014 launch date to May 16, 2014, and (2) paying NLR $6.5 million "on the first Business Day following the date NLR consummates the acquisition of Showboat." CDI would still "pay $1mm to NLR upon signing" an agreement to purchase Showboat. In other words, the $7.5 million escrow arrangement would be scrapped. Indeed, nothing would be paid into escrow; instead, NLR would receive $1 million *after* it signed a purchase agreement with Caesars, and an additional $6.5 million *after* it consummated the purchase of Showboat. On October 28, 2013, Ribis responded: "Bill -- based on our previous discussions I agree to the modification as noted herein -- Nick." (Pl. Ex. F)

At some point, Nicholas Ribis, Jr., a project manager for the Showboat deal, became "disappointed" and "concerned" with the progress of Showboat's

---

[2]    Other evidence suggests that the issue was not resolved until late December 2013. (*See, e.g.*, Pl. Exs. HH 167: 19-25, II)

online gaming and gambling system following a visit to the California office of Churchill Downs Interactive, a subsidiary of CDI.[3] Ribis Jr. concluded that CDI would not be able to "launch" the online gaming and gambling system by May 2014. (DSSF ¶¶ 33-35; PRSSF ¶¶ 33-35)

## C.   Showboat Negotiations Continue

On November 14, 2013, counsel for NLR and Caesars exchanged a draft PSA for Showboat. Under the terms of that agreement, NLR was required to post a $5 million deposit. Ribis sent the draft to Carstanjen the following day. (DSSF ¶¶ 11-13; PRSSF ¶¶ 11-13; Def. Oppo. Ex. C § 3.2)

A week later, on November 21, 2013, Ribis asked Carstanjen if CDI would consider "stepping up" and providing equity funding for Showboat in exchange for a mortgage and warrants on the property. Carstanjen demurred. CDI, Carstanjen testified, had no interest in providing any equity to NLR to help it fund the purchase of Showboat beyond the $1 million it had agreed to pay NLR upon the signing of a PSA with Caesars.[4] (PSF ¶¶ 21-22; DRSF ¶¶ 21-22; Pl. Ex. H)

---

[3]    NLR posits that the visit occurred in September 2013, which CDI does not dispute in substance. The deposition excerpt cited by NLR and Ribis, however, does not provide the date of Ribis Jr.'s trip to California. In fact, it is not at all clear when Ribis Jr. arrived to the conclusion that CDI would not be able to meet the launch date. (Def. Oppo. Ex. E 42:11-16 ("Needless to say, we found out afterwards that they couldn't even come close to November. They couldn't even hit the May 2014 date that they ended up proposing at the end of the day. So I was concerned."))

[4]    Carstanjen explained:

> "Periodically, he [i.e., Ribis] would bring up, 'Why don't you do this [i.e., help fund the acquisition of Showboat],' and every time we brought it up, I would immediately shut it down. . . . 'We are not financing on this. We don't want a brick-and-mortar presence in New Jersey. . . . It's not a market we want to invest in.' That's why we were looking for a partner who had the brick-and-mortar asset. . . . We were never going to be the equity. . . . It was a premise. It's why we went and found Nick [Ribis]."

(Pl. Ex. G 137:11-138:8)

Ribis and Caesars seemed to inch closer to a deal in early-to-mid December. On December 7, 2013, Ribis told Carstanjen that Caesars and NLR were "finishing contract this weekend – signing late Monday, announcement Tuesday." On Tuesday, December 10th, Ribis reported to Carstanjen that "[w]e [a]r[e] done with PSA – lawyers finishing tonight" and that the agreement would be signed "[t]omorrow." (PSF ¶ 12; DRSF ¶ 12; Pl. Exs. L, M)

On Thursday, December 12, 2013, Ribis emailed Carstanjen that he was "ready to sign the Asset Purchase Agreement (APA) with Caesars." But there was a catch, and a big one: NLR needed to post a $5 million deposit within "1 day after execution of APA." CDI, Ribis proposed, should "wire $7.5m into the Escrow Account at Bancorp as per Agreement with NLR upon signing of APA." "NLR has arranged with Bancorp," Ribis continued, "for it [i.e., Bancorp] to advance $5m into the APA Escrow" after it received "CD[I]'s $7.5m." Ribis would then repay Bancorp with CDI's escrowed funds once the Showboat deal closed.[5] Carstanjen rejected the proposal. Noting that he was "having a lot of issues on my end," he reasoned that "[i]f the bank [i.e., Bancorp] can't use our money until closing, then why do we need to put into escrow for them now. . . . I don't think there is a good answer to that question of why we are floating them capital that we get back if the deal doesn't close." CDI, Carstanjen added, had "investment grade credit and we are saying we will be there with the money at closing." Fair enough, Ribis replied: "Bill – in thinking about it [yo]u make a good point – we can figure this out." (PSF ¶ 23; DRSF ¶ 23; Pl. Ex. N)

In mid-to-late December, CDI steeled itself for the possibility that NLR would not acquire Showboat by the January 31, 2014 deadline. On December 16, 2013, Ribis told Carstanjen that NLR would sign an agreement with Caesars that day. That did not happen. Three days later, Carstanjen forwarded

---

[5]    Essentially, Ribis was proposing that CDI put up cash to fully secure Bancorp's position as bridge lender. CDI rightly perceived that this was not very different from being the bridge lender itself, a role it did not want to assume.

Ribis a letter from CDI's general counsel, Alan Tse. "While we were willing to show some flexibility and patience with respect to the October 15th [PSA signing deadline] date," Tse wrote, "CDI has no intention of waiving the January 31, 2014 [Showboat purchase deadline] date at this time." "If NLR fails to meet such requirement," he warned, CDI would be "entitled to remedies, including but not limited to liquidated damages in an amount equal to $2.5 million." Furthermore, CDI would "not tender any further amounts to NLR until NLR complies with the [License] Agreement and closes on the acquisition of Showboat." (PSF ¶¶ 23, 30; DRSF ¶¶ 23, 30; Pl. Exs. O, R)

Two days later, on December 21, 2013, Ribis was still seeking funding for the Showboat deal based on the prospect of future payments under the amended License Agreement. He told a potential private equity investor that "CD[I] has agreed to pay 10m to me – 2.5 has already been advanced and 7.5m will be paid on consummation of transaction to purchase Showboat." (PSF ¶ 31; DRSF ¶ 31, Pl. Ex. S)

In the meantime, the customer data issue continued to plague negotiations with Caesars. The frustration is palpable in a December 19, 2013 email written by an NLR technology consultant to NLR's outside counsel and copied to Ribis: "Given the fact that we have been on this merry-go-round for over 4 months, and Caesars has continually refused to provide this data, someone needs to ask them if they are really serious about selling this property or if they just want to waste everyone[']s time and money." What Caesars was offering, she counseled, "is NOT what we requested or what NLR will need to successfully transition the property." Caesars, however, viewed negotiations as closed. The next day, December 20, 2013, Hession told Ribis that he believed Caesars had been "quite fair in terms of the amount and type of IT data" and that "[m]any of the issues you continue to add to the schedules have been discussed for months and are items we are not able to provide." Attaching a markup of "Showboat_Database Subset (Exhibit M to PSA) (Seller Comments,

12.20.13)," Hession advised Ribis that NLR should consider it Caesars' final offer. (Pl. Ex. JJ, II)

### D.   NLR Fails to Acquire Showboat

NLR came closer to a deal with Caesars in the final week of December 2013. By December 22nd, Ribis testified, he had figured out how to fund the Showboat purchase and could "close it without [CDI]." Four days later, on December 26th, NLR's counsel sent Caesars' counsel executed signature pages of a PSA for Showboat. Caesars' counsel then sent NLR its client's signature pages "to be held in escrow pending our express release upon confirmation from the escrow agent that they have received the $5 million deposit," which needed to be received by 5pm. Before the deadline, Hession told Ribis that Caesars would be "willing to allow our signature pages to remain in escrow through tomorrow at 5pm Eastern time." That deadline, though, came and went without the posting of the $5 million deposit. (PSF ¶ 29; DRSF ¶ 29; Pl. Ex. A 240:16-18, Def. Ex. G)

NLR and Caesars tried again on January 2, 2014, but the $5 million deposit was not received by January 3, 2014. Hession then told Ribis that Caesars had "decided to terminate the sale process of the Showboat" to NLR. That evening, Hession told Carstanjen the news that Caesars would not be selling Showboat to NLR. (Pl. Exs. U, V)

NLR did not execute a definitive agreement with Caesars. Nor, of course, did it acquire Showboat by the contractual deadline, January 31, 2014. That, in Ribis's telling, was because CDI "stepped in with Caesars and . . . poisoned the well so that Caesars wouldn't close with me." At some point, Ribis says, Carstanjen told Hession and an attorney from Villa Enterprises, a potential investor in the Showboat, that Ribis was a "fraud." (PSF ¶ 37; DRSF ¶ 37; Pl. Ex. A 240:1-9, 283:7-8)

Ribis spent between $4 and $5 million in connection with the failed attempt to purchase Showboat. CDI invested over $10 million to acquire

software and support services from iTeamGaming in order to develop
Showboat's gaming system. (DSSF ¶ 36; PRSSF ¶ 36; PSF ¶ 48; DRSF ¶ 48)

## II.   DISCUSSION

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment
should be granted "if the movant shows that there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of law."
FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In
deciding a motion for summary judgment, a court must construe all facts and
inferences in the light most favorable to the nonmoving party. *See Boyle v.
County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing
*Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir.
1994)). The moving party bears the burden of establishing that no genuine
issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–
23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the
burden of proof ... the burden on the moving party may be discharged by
'showing'—that is, pointing out to the district court—that there is an absence
of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-
moving party "must do more than simply show that there is some metaphysical
doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual
evidence that creates a genuine issue as to a material fact for trial. *Anderson*,
477 U.S. at 248; *see also* FED. R. CIV. P. 56(c) (setting forth types of evidence on
which nonmoving party must rely to support its assertion that genuine issues
of material fact exist). "[U]nsupported allegations ... and pleadings are
insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*,
912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243

F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468-69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.*, 19 F. Supp. 2d 254 (D.N.J.1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Philadelphia Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir.1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

**B.    Analysis**

**1.    Breach of Contract**

There is no doubt that NLR breached the License Agreement when it failed to acquire Showboat and then declined to return CDI's $2.5 million. "To establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his

12

obligations under the contract and that the plaintiff sustained damages as a result." *CPS Medmanagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 151 (D.N.J. 2013) (quoting *Murphy v. Implicito*, 392 N.J. Super 245, 265 (App. Div. 2007)).[6] CDI paid NLR $2.5 million pursuant to the Term Sheet. Under the terms of both the License Agreement and Term Sheet, NLR agreed that it would return the $2.5 million if it did not acquire Showboat by January 31, 2014. That it failed to do, and it has since refused to return CDI's money. CDI, in short, has proven the essential elements of its claim: that a contract was formed, that the contract was breached, and that the breach resulted in damages.

As I noted in my October 5, 2015 Opinion, the "real dispute here is over which party breached first." (Opinion 8) Here, as there, NLR argues that it was CDI's breach of the License Agreement or failure to deal in good faith that scuttled the Showboat deal—allegations which I found "barely sufficient" to withstand a motion to dismiss. (*Id.* 11) So the question now is this: Having had the opportunity to conduct discovery, has NLR now produced evidence of a breach by CDI which would excuse its own breach? It has not.

As it did in opposing CDI's motion for judgment on the pleadings, NLR argues that CDI breached the express terms of the License Agreement by refusing or failing to pay over the $7.5 million balance of the rights fee. That allegation now has some factual context: Ribis had persuaded a bank to advance him $5 million as a deposit for Showboat, conditioned on CDI's placing $7.5 million in escrow. Carstanjen knew this, says Ribis, because Ribis told him so.[7] So when CDI refused or failed to put that additional money into

---

[6]   The satisfaction of CDI's own contractual obligations, whether viewed as the subject of a defense or as a fourth element of CDI's claim, *see Darush LLC v. Macy's Inc.*, Civ. No. 12-2167, 2012 WL 2576358, at *2 (D.N.J. July 3, 2012), is tied up with the resolution of NLR's counterclaims, so I discuss it below.

[7]   It is unclear whether that bank was to be Bancorp, which NLR and CDI agreed would hold CDI's $7.5 million in escrow, or Deutsche Bank, which NLR and Caesars agreed would hold NLR's $5 million deposit in escrow. (*Compare* Pl. Ex. N ("NLR has arranged with Bancorp for it to advance $5m into the APA Escrow) Def. Oppo. Ex. A:

escrow, says NLR, CDI knew it was undermining NLR's agreement with
Caesars.

That can't be right, says CDI, because in October 2013—when Ribis
first failed to obtain a PSA agreement on schedule—the parties agreed in
writing to amend their agreement to eliminate CDI's escrow obligation. Under
the amended terms, CDI would pay NLR $1 million, not escrow $7.5 million,
upon the signing of a purchase agreement, and would pay the remaining $6.5
million later, when the sale was consummated. That is why CDI declined
Ribis's November 2013 request that it preemptively place the entire $7.5
million in escrow, in advance of even the signing of an agreement. To be sure, a
multimillion dollar infusion would have been helpful to NLR. CDI, however, was
under no contractual obligation to supply it.

But set the amended terms of the License Agreement aside. Even
under the original, unamended terms of the License Agreement, CDI never
agreed to pay any more than $2.5 million until *after* NLR executed a PSA to
acquire Showboat, *which never happened.* (PSF ¶ 20, 37; DRSF ¶ 20, 37) Ribis
may well have worked out a deal with a bank on the optimistic assumption
that he could get CDI to go along. But CDI was not required to go along; NLR
and CDI had the License Agreement, and CDI was entitled to stand on its
terms.

CDI is clearly correct. The terms of License Agreement (originally or as
amended) are unequivocal: CDI was not obligated to tender any portion of the
remaining balance of the rights fee (whether $1 million, $6.5 million, or $7.5
million) *unless and until* NLR executed a PSA with Caesars to acquire
Showboat, *at the earliest.* NLR never signed a deal with Caesars, so CDI's

---

216:7-17 ("Bill [Carstanjen] and I [Ribis] had been talking for weeks about him putting
up the money in escrow at Bancorp, and he knew I was going to -- they were going to
advance me $5 million personally once that was deposited.") *with* Def. Oppo. Br. 13,
15 ("NLR had negotiated with Deutsche Bank as well as Caesars for the bank to
advance $5,000,000 . . . . Without CDI's escrowed funds, Deutsche Bank would not
advance the $5,000,000 it needed for the deposit under the proposed PSA with
Caesars.")

obligation to remit any portion of the remainder of the rights fee was never triggered. The amendment, or not, of the License Agreement is therefore something of a red herring.[8] In either case, CDI's obligations to post the remaining $7.5 million were conditioned on an event—NLR's execution of a definitive agreement to acquire Showboat—that never occurred.

That condition precedent was at the heart of the recursive cycle in which Ribis found himself: to execute the PSA with Showboat, he needed to come up with $5 million; to get the $5 million, he needed CDI's $7.5 million; to get the $7.5 million, he needed to execute the PSA with Showboat; and so on. Ribis wanted to solve his problem by converting CDI into the equivalent of an equity investor. But CDI did not sign up to be an equity investor; NLR was to

---

[8]   Although it is not necessary for my decision, I would find that the amendment was effective, and CDI therefore had no escrow obligation. Recall that Ribis, in response to Carstanjen's proposal, Ribis stated that he "agree[d] to the modification as noted herein." (Pl. Ex. F) NLR argues that this email exchange does not comply with the "Amendments and Waivers" provision of the License Agreement, which required all amendments to be "in writing and signed by authorized representatives of both Parties." (Pl. Ex. E ¶19.h) NLR also argues that the amendment was not supported by consideration. On both scores, I disagree.

As a matter of law, I see no reason why an email exchange cannot stand in for a signed writing, if the parties so intend. A contract provision requiring modification by writing "may be expressly or impliedly waived by the clear conduct or agreement of the parties or their duly authorized representatives." *Vincent Pools Inc. v. APS*, N.J. Super. LEXIS 595, Dkt. No. A-2679-13T3, A-2688-13T3, at * 21 (App. Div. 2016) (citing *Home Owners Constr. Co v. Glen Rock*, 34 N.J. 305, 316 (1961). Here, Ribis's assent to Carstanjen's proposal was unequivocal. It was not, as NLR suggests, subject to a subsequent memorialization. When asked point blank whether he "had agreed to it and then [was] waiting for the formal documentation," Ribis replied: "We had an exchange of emails. They said what they said." (Def. Opp. Ex. A 220:12-19)

The amendment was also supported by adequate consideration. In exchange for CDI's relinquishment of the right to hold NLR in breach for failing to meet the October 15, 2013 deadline NLR gave up the right to insist on CDI's posting of the $7.5 million prior to closing. (Pl. Ex. F (noting that "the point of these changes are (i) to extend the date on which we must have the on-line site launched an additional 45 days to address the heightened challenge we now have given the delays in signing and public announcement of your deal with Caesars and (ii) to avoid CDI needing to place money in escrow until closing.")) That is more than the proverbial peppercorn. *Oscar v. Simeonidis*, 800 A.2d 271, 276 (App. Div. 2002) ("Any consideration for a modification, however insignificant, satisfies the requirement of a new and independent consideration.")

obtain its financing elsewhere. CDI was not obligated to prematurely tender the remainder of the rights fee, and in fact had contracted for precisely the opposite result. CDI breached no obligation, and its conduct is therefore no excuse for NLR's breach.

### 2.    Implied Covenant of Good Faith and Fair Dealing

NLR's fallback position is that, even if CDI did not breach the literal terms of the License Agreement, it breached the implied covenant of good faith and fair dealing that is inherent in every contract. CDI, NLR argues, repeatedly reassured Ribis that it would place $7.5 million in escrow, but reneged on that promise. NLR also contends that CDI falsely represented that it could launch and operate an online gaming and gambling system for Showboat, knowing that it could not. At the motion to dismiss stage, I noted that the "crux" of NLR's implied covenant counterclaim "appears to be that CDI lacked the ability and intent to perform, but merely used NLR and Ribis to gain an entrée to the casino industry." (Opinion 11) In that context, I ruled that NLR's allegations were "factually very thin" but "permit[ted] the case to go forward, so that the issues can be explored on a motion for summary judgment." (*Id.*) That exploration is now at its end, and it is clear that CDI is entitled to summary judgment on NLR's counterclaim for breach of the implied covenant of good faith and fair dealing.

An implied covenant of good faith and fair dealing is inherent in every contract. *See Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997); *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 169-70 (3rd Cir. 2001). Generally, New Jersey has recognized an independent cause of action for breach of the implied covenant in three situations: "(1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's

16

unfair exercise of discretion regarding its contract performance." *Berlin Med. Assocs., P.A. v. CMI N.J. Operating Corp.*, 2006 WL 2162435, at *9 (N.J. Super. Ct. App. Div. Aug. 3, 2006) (affirming dismissal of good faith and fair dealing claim as redundant of breach of contract claim where no facts suggested a pretext). A cause of action may lie where a party's acts "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Wade v. Kessler Inst.*, 798 A.2d 1251, 1262 (N.J. 2002) (internal quotations and citation omitted). "[P]roof of bad motive or intention is vital to an action for breach of the covenant." *Westmont Dev. Grp., LLC v. Twp. of Haddon*, 625 F. Supp. 2d 178, 195 (D.N.J. 2009) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005)).

Among other things, then, NLR needed to offer some evidence tending to suggest that CDI performed in bad faith. *Mont Dev. Grp. LLC v. Twp. Of Haddon*, 625 F. Supp. 2d 178, 195 (D.N.J. 2009) ("[P]roof of bad motive or intention is vital to an action for breach of the covenant.") (citing *Brunswick Hills Racquet Club, Inc., v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005)). NLR has failed to do so. In fact, it has abandoned its claim that CDI pretextually leveraged the License Agreement to gain a foothold in the casino industry. (*Compare* Def.'s Countercls. and Third-Party Compl.¶¶ 19, 28-30 *with* Def. Oppo. 33-36) NLR concedes that Ribis does not know anyone at Saratoga Casino & Raceway ("Saratoga"), CDI's subsequent joint venture partner, and did not introduce CDI to anyone at Saratoga. (PSF ¶¶ 54-58, DRSF ¶¶ 54-58)

Without evidence of bad faith or untoward motive, NLR's claim that CDI violated the implied covenant by refusing to place $7.5 million in escrow before NLR had inked a purchase agreement really adds nothing to its claim of breach of contract. Cash to make a $5 million down payment was not one of the agreed-upon "fruits of the contract." As discussed above, CDI had no contractual obligation to post the remainder of the rights fee unless and until

NLR signed a definitive agreement to acquire Showboat, which never happened. The implied covenant cannot re-write or "override an express term in a contract" in that manner. *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001). CDI acted precisely as the agreeing parties explicitly contemplated that it would. CDI did not circumvent or defeat its obligations under the contract, which were limited and carefully defined.

Even less tenable is the claim that CDI violated the implied covenant because, as of September 2013, NLR considered that CDI was not making fast enough progress in its development of the Showboat gaming system. Recall that, under the Agreement—which, after all, had only just been signed—CDI had until at least April 2014 to develop the Showboat gaming system. (And that obligation, of course, had no real world application unless and until NLR timely, or ever, acquired Showboat.) If CDI failed to meet the launch date, the penalty was explicitly prescribed: NLR would have been entitled to $10,000 per day in liquidated damages. Had CDI's duty arisen, and had CDI failed to meet its deadline, NLR's remedy would have sounded not in good faith and fair dealing but instead in ordinary breach of contract.[9]

---

[9]     NLR does not claim that CDI's conduct amounted to an anticipatory breach. *Ross Systems v. Linden Dari-Delite, Inc.*, 173 A.2d 258, 340-41 (N.J. 1961) ("An anticipatory breach is a definite and unconditional declaration by a party to an executory contract – through word or conduct – that we will not or cannot render the agreed upon performance.") And such a claim, if asserted, would fail. There is no evidence, for example, that Ribis Jr. communicated his concerns concerning the development of the Showboat gaming systems to anyone, let alone to CDI. Nor is there any evidence that those concerns gave rise to reasonable grounds to believe that CDI would not meet the launch deadline, or that anyone at NLR made a demand for adequate assurance. *Spring Creek Holding Co. v. Shinnihon U.S.A. Co.*, 399 N.J. Super. 158, 179-80 (App. Div. 2008) ("Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach . . . the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.") (quoting the *Restatement (Second) of Contracts* § 251)).

In short, NLR's counterclaim for breach of the implied covenant of good faith and fair dealing, like its claim of breach of contract, fails for lack of evidence. CDI's motion for summary judgment on these claims is GRANTED.

### 3.    Defamation, Trade Libel, and Slander

Ribis's counterclaim for defamation, trade libel, and slander suffers from a similar paucity of evidence. Its entire factual basis is the following exchange from Ribis's deposition:

> Q: Okay. Now you've described a couple of different times in your testimony today, Mr. Ribis, statements that you believe Mr. Carstanjen made. I guess the two that you've mentioned are to Mr. Hession and to someone at Villa Enterprises. Is that the basis for your defamation claim in this case.
>
> A: Yes, general use of the word "fraud," that I was a fraud."
>
> * * *
>
> Q: Okay so in terms of who said what to whom and when in support of your defamation claim, we've got Mr. Carstanjen having a conversation with Mr. Hession?
>
> A: Conversations.
>
> Q: Okay. One or more?
>
> A: Yes.
>
> Q: And you learned of these from Mr. Hession?
>
> A. Yes.
>
> Q: And we've got your belief that Mr. Carstanjen also spoke to -- or no, no, that someone at Churchill Downs spoke to someone at Villa Enterprises?
>
> A: The lawyers at Villa Enterprises.
>
> Q: The female lawyer that we saw in the email, or someone else?
>
> A: Yes I think so.
>
> Q. Okay. And what exactly is it your understanding that was communicated in those situations? I just want to get as best you can –
>
> A. Such as I was a bad guy.
>
> Q. Okay. And our best point of when those occurred is what?

19

A. I really don't – don't have a date.

(Pl. Ex. A. 282:24-285:5) This testimony is neither substantial nor specific; it is insufficient to repel a motion for summary judgment.

Missing from NLR's papers are any facts tending to show that Carstanjen's statements, assuming they occurred, rose above the level of "name calling."[10] *Ward v. Zelikovsky*, 136 N.J. 516, 530 (1994). Nor are there any facts indicating where and when the allegedly defamatory statements occurred, or describing Carstanjen's state of mind in uttering them.[11] Ribis's account is secondhand, and no corroborating evidence was adduced from any person who heard the statements. Ribis's testimony furnishes no basis on which to conclude, as NLR contends, that Carstanjen's statements to Hession or other third parties caused the Showboat deal to break down. I cannot assume, absent evidence, that they did.[12]

I will therefore GRANT CDI's motion for partial summary judgment on NLR's defamation counterclaim.

---

[10]     Under New Jersey law, the elements for written and oral defamation (slander) are as follows: (1) a false and defamatory statement; (2) communication to a third party, and (3) a sufficient degree of fault." *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J.). Trade libel, which is really defamation in the context of a person's trade or business, has the following elements: "(1) publication, (2) with malice, (3) of false allegations concerning [plaintiff's] property, product or business, and (4) special damages, *i.e.*, pecuniary harm." *Mayflower Transit LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004).

[11]     While a negligence standard applies to statements directed towards private figures, trade libel plaintiffs must show actual malice. *Pactiv Corp. v. Perk-Up, Inc.*, Civ. No. 8-5072, 2009 U.S. Dist. LEXIS 72796, at *29 (D.N.J. Aug. 18, 2009).

[12]     Indeed, without at least an approximate date for the allegedly defamatory statements, such a demonstration would be very difficult to make. Beyond the collapse of the Showboat deal, Ribis does not identify any other business opportunities he lost as a result of Carstanjen's statements. Special or particularized damages must be shown in some instances of slander and in all instances of trade libel. *See generally Ward*, 136 N.J. at 540-42 (discussing distinctions between slander *per se* and slander *per quod* and concomitant distinction between special and presumed damages); *Bocobo Radiology Consultants of S. Jersey, P.A.*, 477 F. App'x 890, 901 (3d Cir. 2012) (upholding summary judgment for defendants on trade libel claim for lack of showing damages).

### 4.    Fraud

NLR and Ribis seek summary judgment on CDI's fraud claim. A claim for common law fraud in New Jersey has five elements: (1) a material misrepresentation of a present or past fact by the defendant; (2) the defendant's knowledge or belief of its falsity; (3) an intent that the plaintiff rely on the misrepresentation; (4) reasonable reliance by the plaintiff; and (5) resulting damages. *Banco v. Popular N. Am. V. Ghandi*, 184 N.J. 161, 172-73 (2005). CDI, NLR argues, cannot prevail on prongs (1), (4), and (5): Ribis's representations to Carstanjen concerning the status of NLR's negotiations with Caesars are non-actionable statements of opinion concerning future events; CDI did not rely on them; and they caused no damage to CDI. I focus on the damages element (which is intertwined with issues of reliance and causation), as to which I find CDI has failed to raise a genuine issue of material fact.

Ribis's false statements that a deal was imminent between September and December 2013 could be actionable as fraud.[13] To be sure, "statements as to future events, expectations, or intended acts, do not constitute misrepresentations despite their falsity, *if the statements were not made with the intent to deceive*." *Notch View Assocs. v. Smith*, 260 N.J. Super. 190, 202 (Law Div. Essex Cty. 1992) (emphasis added). But a jury could reasonably conclude that Ribis's misrepresentations were not projections about the likelihood of future events but calculated attempts to deceive CDI about a presently existing fact: the current status of negotiations with Caesars.[14]

---

[13]    The six specific representations are as follows: (1) on September 17, 2013, Ribis was "signing the PSA probably tomorrow"; (2) on October 9, 2013, Ribis had "talked to C we r complete"; (3) on December 7, 2013, Ribis was "finishing the contract this weekend – signing late Monday, announcement Tuesday"; (4) on December 10, 2013, Ribis and Caesars "r done PSA" and signing "tomorrow"; (5) on December 12, 2013, Ribis was "ready to sign the Asset Purchase Agreement with Caesars"; and (6) on December 16, 2013, Ribis was Caesars were signing "today." (PSF ¶ 23; DRSF ¶ 23; Pl. Exs. J-O)

[14]    NLR leans heavily on *Alexander v. Cigna Corp*, 991 F. Supp. 427, 435 (D.N.J. 1998), which puts the point more forcefully than do some New Jersey state cases: "Statements as to future or contingent events, to expectations or probabilities, or as to

Substantial evidence in the record would support this view. NLR and Caesars, for example, did not come to agreement on the customer data issue—a deal-breaker for NLR[15]—until sometime in December. Ribis was still seeking private equity investors as late as December 18, 2013. Based on that fact alone, a jury could reasonably conclude that NLR did not have the necessary financing in place when Ribis told CDI that negotiations were "complete," "done," or "finish[ed]", and that Caesars and NLR would sign "today" or "tomorrow." (Pl. Exs. J-O) Although CDI says it was not aware of all of these background negotiations, Ribis surely was. *See Campano v. Stone Harbor*, 530 F. Supp. 1254, 1265 (D.N.J. 1982) (reasoning that a cause of action for fraud may lie where a "statement [is] impossible to fulfill based on contingencies known to the promisor at the time of the statement but unknown to the promisee.") In short, given the total mix of evidence in the record and drawing all inferences in favor of CDI, I think these alleged statements could constitute actionable misrepresentations.

CDI's argument as to reliance is more porous. CDI, it must be said, is well-established company led by experienced professionals. Though Carstanjen may not have been privy to specifics, he knew by October 28, 2013, at the latest, that the deadline for signing an agreement had passed and that progress had stalled because of the customer data issue. He was also at least generally aware that financing for the Showboat deal was far from set in stone, and that

---

what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." Even the *Alexander* court recognized, however, that the key inquiry is what the utterer intended. *Id.* at 435 (citing *Notch View* for the proposition that "statement as to a future event [may be an] actionable representation when 'the defendant [has] . . . no intention at the time he makes the statement of fulfilling the promise.'") I also note that Ribis's statements lack indicia of "puffery" and were not stated in the future or conditional tense, as in *Alexander. Id.* at 436 (reciting the alleged misrepresentations, including statements that "relationship would be long lasting," "COMPAR would take SIGNA into the twenty-first century and beyond," and the "COMPAR program was like a 'marriage'," and noting that "virtually all of the statements . . . use words such as 'will,' 'plan,' or 'expect' to indicate their future orientation.")

[15]     Ribis, recall, said he would be "out of business" on "day two" if he closed on the deal without resolving the customer data issue. *See* p.5, *supra.*

Ribis was attempting to cobble together funding from third parties. (DSSR ¶ 18; PRSSF ¶ 18) On the other hand, CDI maintains that it had limited insight into NLR's negotiations with Caesars and necessarily relied on Ribis's statements in deciding not to declare NLR in breach of the License Agreement.[16] (PSSF ¶11) So while I have some doubt that CDI actually and reasonably relied on all of Ribis's representations, the resolution of this issue seems to hinge on disputed issues of material fact.

I do not think, however, that CDI has demonstrated that it relied on Ribis's misrepresentations to its detriment, resulting in damages. "Actual damages are an element of the cause of action in fraud or deceit." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 189 N.J. Super. 327, 354 (App. Div. 1983). Relatedly, a plaintiff must also show that the defendant's "conduct was a substantial contributing factor in causing [a] loss." *McCabe v. Ernest & Young, LLP*, 494 F.3d 418, 439 (3d Cir) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 58, 691(1997)).

CDI contends that Ribis's misrepresentations caused it damages in excess of $12.5 million dollars. That figure represents the sum of (1) the $2.5 million CDI paid NLR pursuant to the Term Sheet; (2) the unspecified cost of new office space, staff, equipment; (3) and the $10 million it paid iTeamGaming for software development and support services. But CDI incurred, or decided to incur, virtually all these expenses *before* the date of the first alleged misrepresentation, September 17, 2013. It was on August 3, 2013, for example, that CDI agreed to pay NLR $2.5 million under the Term Sheet, and it did so

---

[16]   CDI claims that it would have declared NLR in breach of the License Agreement had it not been for Ribis's misrepresentations. That claim is in tension with its claim that the consideration supporting the October 28, 2013 amendment to the License Agreement was the relinquishment of its right to declare NLR in breach. Four of the six alleged misrepresentations occurred after October 28, 2013. CDI therefore could not have reasonably relied on those statements when it decided to let the signing deadline (if not the consummation deadline) ride.

shortly thereafter.[17] (Pl. Ex. D § 1.6(a)) It was "immediately" thereafter that CDI decided to lease new office space and hire engineers.[18] (Pl. Ex. OO 39:23-40:21) It was on September 4, 2013 that CDI signed a binding term sheet with iTeamGaming, agreeing to pay it $10 million (the agreement was finalized on October 2, 2013). (Pl. Ex. PP, Def. Supp. Ex. A)

CDI has not established that these expenses flowed from Ribis's alleged fraudulent misrepresentations, which occurred later.[19] NLR's motion for partial summary judgment on CDI's fraud claim is therefore GRANTED.

---

[17]    CDI argues that Ribis's misrepresentations caused it "lose" the $2.5 million because they prevented CDI from declaring NLR in breach of the License Agreement. Here, too, CDI's argument is in significant tension with its argument that the consideration supporting the October 28, 2013 was CDI's decision to not hold NLR in breach. With respect to the two statements Ribis made before October 15, 2013 (he was "signing the PSA probably tomorrow" and had "talked to C we r complete"), CDI presents no evidence that they substantially contributed to CDI's decision not to hold NLR in breach. It in fact decided not to do so, even though it knew that those statements were false. At any rate, CDI's "loss" of the $2.5 million was not due to anything Ribis said but rather his inability to close the Showboat deal by January 31, 2014, as required by the License Agreement.

[18]    I base this conclusion only on the evidence in the record before me. Certainly it is possible that CDI could have made some of these expenditures in the weeks following September 17, 2013. But I cannot assume so, and CDI has provided no evidence concerning when and how much it paid for its new office space, employees, or equipment. Insofar as CDI's fraud claim relies on office space, staff, and equipment expenses, it has therefore failed to articulate any actual damages.

[19]    In passing, NLR argues that the liquidated damages provision contained in Section 10.D.iii. of the License Agreement would limit CDI's damages in any event to $2.5 million. That provision states:

> The Parties expressly acknowledge and agree that, in light of the difficulty of accurately determining actual damages with respect to the circumstances in which amount is payable pursuant to Section 10.D.i. or Section 10.ii, the right to such payment: (A) constitutes a reasonable estimate of the damages that will be suffered by reason of any such circumstance, (B) is not a penalty, and (C) shall be in full and complete satisfaction of an and all damages arising as a result of such circumstance.

(Pl. Ex. E) Section 10.D.i and Section 10.ii concern CDI's failure to meet the launch date and NLR's failure to buy Showboat. Because I find that CDI has failed to show that Ribis's conduct caused it damage, I need not address whether this provision also caps damages arising out of a fraud.

### III.    CONCLUSION

For the foregoing reasons, the cross-motions for summary judgment (ECF Nos. 61, 62) are GRANTED. This disposes of all claims as to all parties. An appropriate Order will accompany this Opinion.

Dated: March 6, 2017

_____
**KEVIN MCNULTY**
**United States District Judge**

25