UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHURCHILL DOWNS, INC.,** <br><br> Plaintiff, <br><br> v. <br><br> **NICHOLAS L. RIBIS, SR. AND NLR VENTURES, LLC,** <br><br> Defendant. | Civ. No. 14-03342 (KM) (MAH) <br><br> **OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

  In 2013, defendant Nicholas L. Ribis signed an agreement with plaintiff Churchill Downs, Inc. ("CDI") to purchase a casino in Atlantic City. Ribis signed the agreement on behalf of two purported LLCs: NLR Entertainment, LLC, ("NLRE") and its subsidiary, NLR Acquisitions, LLC, ("NLRA") (collectively, the "NLR LLCs"). CDI paid the NLR LLCs $2.5 million dollars towards purchasing the casino; pursuant to the agreement's terms, however, if the NLR LLCs failed to complete the purchase, then they were required to pay CDI the money back as liquidated damages. The purchase fell through, the casino was never bought, and the LLCs never refunded CDI the money.

  Five years later, after this Court had granted judgment in favor of CDI against NLRE for breach of contract, it was revealed that NLRE had never existed; Ribis never actually formed the LLC. Similarly, NLRA had not existed at the time that it purportedly entered into the agreement with CDI, though Ribis did form the company several months later.

  CDI seeks to hold Ribis individually liable on the contract. For the reasons that follow, CDI's motion (DE 110) is **GRANTED**.

1

I. **BACKGROUND**[1]

CDI, NLRE, and NLRA entered into a binding Term Sheet dated August 3, 2013, which Ribis signed on behalf of the NLR LLCs. (PSTMF ¶ 2.) CDI and NLRA subsequently entered into a License and Operating Agreement on September 4, 2013, which superseded and formalized the Term Sheet agreement but contained essentially the same terms. (DE 110-5.) Under the agreements, CDI would provide online gambling services to the Showboat Atlantic City Hotel and Casino after the NLR LLCs purchased that casino. (DE 110-4 ¶ 1.4.) In exchange for the right to provide online services, CDI paid a $2.5 million fee to the NLR LLCs upon execution of the Term Sheet; an additional $7.5 million was due under the agreement upon the NLR LLCs' acquisition of the Showboat. (*Id.* ¶ 1.6.) If the NLR LLCs failed to close on the acquisition of the Showboat by January 31, 2014, however, they were obligated under the agreement to repay CDI the entire $2.5 million. (*Id.*)

CDI paid the NLR LLCs the initial $2.5 million. The NLR LLCs never closed on the acquisition of the Showboat, and never repaid CDI the $2.5 million. (PSTMF ¶ 1; DS2TMF ¶ 7, 15.) CDI then commenced this action against NLRE on February 25, 2014, and prevailed on a summary judgment motion on March 6, 2017. (*Id.* ¶¶ 1, 3.)

---

[1] Certain key items from the record will be abbreviated as follows:

| | | |
|---|---|---|
| DE | = | Docket Entry |
| Opp. | = | Defendant's Opposition (DE 114-1) |
| PSTMF | = | Plaintiff's Statement of Material Facts (DE 110-1) |
| DSTMF | = | Defendant's Response to Plaintiff's Statement of Material Facts (DE 114) |
| DS2TMF | = | Defendant's Supplemental Statement of Undisputed Facts |
| March 6, 2017 Op. | = | March 6, 2017 Opinion as corrected on March 10, 2017 (DE 71) |
| April 4, 2017 Judgment | = | April, 4, 2017 Judgment (DE 76) |
| September 25, 2018 Op. | = | September 25, 2018 Opinion (DE 95) |
| Ribis Dec. | = | Declaration of Nicholas L. Ribis (DE 114-2) |

In ruling on CDI's summary judgment motion, I found that NLRE was obligated to repay the $2.5 million and had not done so. (*Id.* ¶ 3; March 6, 2017 Op.) The theory was breach of contract: I found that there was "no doubt that NLR[E] breached the License Agreement when it failed to acquire Showboat and then declined to return CDI's $ 2.5 million." (March 6, 2017 Op. at 12.) NLRE did not dispute its obligation under the contract; rather, it asserted that CDI had breached the agreement first, either by acting in bad faith or by breaching the License Agreement. (*Id.* at 13.) I concluded that CDI had not breached the contract first, which might have excused NLRE's breach. (*Id.*) In that same action, CDI brought a claim for fraud against Ribis based on certain statements he made to them in September and December 2013 indicating that a deal with a casino was soon forthcoming, which I rejected on the ground that CDI could not show any damages. (*Id.* at 23–24.) I entered judgment in favor of CDI against NLRE for $2.5 million on April 4, 2017. (April 4, 2017 Judgment.)

Ribis represented to CDI, and repeatedly to this Court, that NLRE was a limited liability company formed under Delaware law which was owned solely by Ribis. (PSTMF ¶¶ 4–5; DSTMF ¶¶ 4–5.) When CDI initiated post-judgment discovery in aid of execution on the judgment, however, it learned that NLRE was not, and never had been, incorporated in Delaware or any other state. (PSTMF ¶ 7; DSTMF ¶ 7.) CDI also learned that NLRA, the subsidiary of NLRE referenced in the Term Sheet agreement, was not formed as a legal entity until December 2013, several months after the agreements were executed. (*Id.* ¶ 8; DSTMF ¶ 8; DE 110-10.)

According to Ribis, this was all an innocent error. He hired Willkie Farr & Gallagher LLP to represent him in the negotiations with CDI. Willkie Farr, he says, was responsible for "all legal nuances of the transactions," including "form[ing] NLR[E] and NLR[A]," which Ribis claims he "expressly instructed" them to do. (Ribis Decl. ¶¶ 8–9.) Ribis claims that he "believed NLR[E] and NLR[a] to be duly formed limited liability companies" and asserts that he "had no reason to think otherwise," arguing that his attorneys "prepared the formal

3

agreements, which provided the corporate structure of the NLR entity entering into the agreement." (*Id.* ¶ 12.) He claims that the "first time [he] learned that NLR[E] was never duly formed by [his] attorney was through CDI's motion to modify the final judgment filed in 2018." (*Id.* ¶ 14.)

After CDI determined that NLRE had never existed, it moved to modify the April 4, 2017 judgment to impose liability on Ribis individually. (DE 90.) I partially granted its motion, permitting it to amend its complaint to add Ribis individually. (September 25, 2018 Op.) I concluded that amending the judgment to impose liability on Ribis directly would be a step too far, reasoning that "I cannot award judgment on claims that were not pled or meaningfully explored in discovery." (*Id.* at 7.)

CDI then amended its complaint on February 18, 2019 to add Ribis and another LLC, NLR Ventures, LLC, as defendants. (DE 96.) It then initiated discovery. Once discovery ended, CDI filed this motion for summary judgment as to Ribis's individual liability. (DE 110.)

## II. DISCUSSION

### A. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district

court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome

of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B. Validity and preclusive effect of the April 4, 2017 judgment

The parties dispute the extent to which the April 4, 2017 judgment against NLRE may estop Ribis. Ribis argues that he is not privy to that judgment because it was against NLRE, and that the judgment against NLRE was in any event void because it was entered against a non-existent entity. (Opp. at 10–11.) The convenient result of Ribis's mistake, from Ribis's point of view, would be that there is no judgment at all. CDI demurs, and adds that Ribis cannot attack the prior judgment in this proceeding; his recourse, says CDI, was *via* an appeal or motion for reconsideration. (Reply 7–8.).

It is true that my April 4, 2017 judgment of contract breach was phrased solely in terms of NLRE, which was presented to the court as the relevant contracting party. I determined that NLRE breached the Term Sheet and Licensing agreements, and that NLRE therefore owed $2.5 million, plus interest, pursuant to the liquidated damages clause. (March 6, 2017 Op. at 12–16; DE 76.) I was not called upon to, and did not, rule that Ribis was liable on the contract.[2] The parties' dispute, therefore, boils down to a disagreement over whether Ribis is collaterally estopped from disputing my findings as to NLRE on summary judgment. I agree with CDI that he is.

I first consider privity. "Mutuality of parties no longer is an essential condition of collateral estoppel," but "the party against whom collateral estoppel is to be invoked must have been in 'privity' with the party in the first action." *Zirger v. General Accident Ins. Co.*, 144 N.J. 327, 338 (N.J. 1996) (citing *Wunschel v. City of Jersey City*, 96 N.J. 651, 658 (N.J. 1984)). "Privity" is "necessarily imprecise" and "states no reason for including or excluding one

---

[2]    As noted above, CDI brought only fraud claims against Ribis individually, and I granted summary judgment on those claims in Ribis's favor. (March 6, 2017 Op. at 24.)

6

from the estoppel of a judgment," but rather "is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the [collateral estoppel]." *Id.* (quoting *Bruszewski v. United States*, 181 F.2d 419, 423 (3d Cir. 1950) (Goodrich, J., concurring)).

A privity relationship is "usually considered 'close enough' only when the party is a virtual representative of the non-party, or when the non-party actually controls the litigation." *Id.* (quoting *Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 176 (3d Cir. 1994) (applying New Jersey law)). As a rule, there must be "such an identification of interest between the two as to represent the same legal right," *id.*, though where a party has "had his day in court on an issue," privity is properly found, *McAndrew v. Mularchuk*, 38 N.J. 156, 161 (1962); *see also Taylor v. Sturgell*, 553 U.S. 880, 895 (2008) (collateral estoppel applies to nonparties that "'assumed control' over the litigation in which [a] judgment was rendered" and had "the opportunity to present proofs and argument" and therefore "had [their] day in court").

It is clear that Ribis was in privity with NLRE in the previous litigation. He was a party to the action, although not to the contract count. He directed NLRE's defense against CDI's motion for summary judgment. He and NLRE were represented by the same attorneys and submitted a joint statement of material facts. (*See* DE 66; DE 66-1; DE 66-2). Ribis repeatedly represented himself to CDI and this Court as NLRE's sole shareholder. (PSTMF ¶¶ 4–8; DSTMF ¶¶ 4–8). Ribis had every opportunity to present arguments on NLRE's behalf, and did so vigorously, submitting numerous filings defending against the claims and contesting discovery. (*See* DE 1–116, *passim*). Ribis's financial connection to NLRE, and his full involvement in the litigation on NLRE's behalf, indicates that he and NLRE shared identical interests in protecting NLRE from liability. Ribis was in privity with NLRE.

Ribis next argues that my prior judgment cannot have any estoppel effect because it was void, having been rendered against a nonexistent entity. He

7

cites *Conway v. Samet,* in which a New York court concluded that a judgment against a nonexistent corporation was void and could not form the basis for res judicata or collateral estoppel:

> The predicate of either res judicata or collateral estoppel is a valid prior judgment. The 1964 judgment upon which plaintiffs rely to establish the amount of their damages was obtained by default against a nonexistent corporation. Since the corporation was nonexistent, the court obtained jurisdiction over no one, its judgment determined nothing and being void cannot be asserted as an estoppel.

300 N.Y.S.2d 243, 247 (Sup. Ct. N.Y. 1969); *see also First Nat'l Bank v. Alexander,* 236 S.W. 229, 230 (Tex. 1921) (judgment against nonexistent corporation is a "nullity"); *Leckie v. Seal,* 161 Va. 215, 223 (Va. 1933) ("where the right party is sued by the wrong name and makes no objection, the judgment against him by the wrong name is binding . . . . [though w]here the mistake in the name of the corporation . . . . is so material . . . that no such corporation exists, it is fatal at the trial."). Some courts, however, appear to disagree with this principle. *Jones v. Fuller,* 280 Ky. 671, 675 (Ky. 1939) (finding that judgment against nonexistent corporation could have bound individual had service against corporation been sufficient); *Akande v. Transamerica Airlines, Inc.* Del. Ch. LEXIS 68 at *63–64 (Del. Ch. May 25, 2007) (permitting judgment against nonexistent corporation for up to three years after corporation was dissolved).

    I am not convinced that citation to *Conway* frames the issue correctly. To begin with, this was not a default judgment against an absent corporation that turned out not to exist. It was a fully litigated case in which the corporation's sole shareholder mounted a full defense. Nor is it a case in which the plaintiff made a mistake and sued the wrong party. On the contrary, it sued the very party on whose behalf Ribis signed the contract. Ribis now attempts to capitalize on his own (or possibly his lawyers') mistake, a wholly distinguishable situation.

As I see it, Ribis's belatedly-discovered failure to incorporate NLRE signifies that NLRE functioned as no more than a "doing business as" (d/b/a) name for Ribis himself. There is no doubt that Ribis is the human being with whom CDI dealt, and that he held out NLRE as his wholly-owned entity. Whether inadvertently or not, he falsely conveyed to CDI that NLRE was an incorporated entity. CDI was entitled to rely on Ribis's representations that NLRE existed. Incorporation of NLRE, after all, was not for CDI's benefit; like any corporate entity, it was a means for Ribis to protect himself against unlimited personal liability. It would be inequitable to hold that his *failure* to incorporate NLRE protects him in precisely the same manner. By failing to incorporate NLRE, Ribis allowed it to remain no more than a name. But it was thus a name *for Ribis*—a d/b/a.

Courts tend to find judgments against a d/b/a entity to be binding against the individual standing behind it. In *Chandler v. Pacific Coast Funding*, for example, the plaintiffs received a judgment against the defendant's d/b/a, which was not a separately incorporated entity, but merely a separate business name for the defendant. 2003 Cal. App. Unpub. LEXIS 583 at *11 (Cal. Ct. App. Jan. 21, 2003). The court concluded that the judgment against the d/b/a was a judgment against the individual, because "[a] person doing business as a fictitious name remains personally liable for the debts of the fictitiously named entity." *Id.*; *see also Pinkerton's, Inc. v. Superior Court*, 49 Cal. App. 4th 1342, 1348 (Cal. App. 1996) (same); *Wood Mfg. Co., Inc. v. Schultz,* 613 F. Supp. 878, 884 n.7 (W.D. Ark. 1985) (same); *American Exp. v. Beryle*, 202 Ga. App. 358, 360 (1991) (same); *Jaffe v. Nocera*, 493 A.2d 1003, 1008 (D.C. App. 1985); *State v. Ivanhoe*, 798 P.2d 410, 412 (Ariz. 1990). In short, it is creation of an adequately capitalized corporation, not the invention of a fictitious name, that shields an individual from liability.

There does not seem to be a New Jersey case on point. I conclude, however, that the judgment against NLRE was not a void judgment against nobody, but rather a judgment against Ribis, based on the rationales of the

9

d/b/a cases cited. Ribis represented that NLRE was an existing entity, controlled by him, and was at least negligent—if not fraudulent—in failing to disclose to CDI that there was no such entity. He cannot be permitted to benefit from his apparent abuse of the corporate form. *See DEP v. Ventron Corp.*, 94 N.J. 473, 500 (N.J. 1983) (corporate form should not be permitted to be abused so as to "defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise evade the law").

On discovery of the facts regarding NLRE, however, I did not merely convert the judgment into one against Ribis, although perhaps I could have done so. After all, Ribis was served as a party defendant,[3] he appeared in the action, and he controlled the defense of the action, including the contract claim against NLRE. I therefore reject Ribis's argument that the prior judgment was void. His lapse did not deprive him of any procedural opportunity to which he would have been entitled if he had properly disclosed the status of NLRE at the outset.[4] I remained concerned, however, that on at least one version of the facts Ribis might have been taken by surprise and failed to put his best foot forward on the issue of personal liability. So I held in my September 25, 2018 opinion that CDI would be given a chance to amend its complaint, and that Ribis would be given a chance to respond. *See Aouf v. Pyramid Express Corp.*, 2019 N.J. Super. Unpub. LEXIS 1079 at *14–15 (App. Div. May 10, 2019); *see also Nelson v. Adams USA, Inc.*, 529 U.S. 460, 467 (2000). I permitted additional discovery and granted Ribis the opportunity to make factual and legal arguments in opposition to personal liability on the judgment.

---

[3]     He was served in his own right, because some of the claims were directed against him personally. Therefore, it is not necessary to impute notice of the action to him *Cf Atkinson v. North American Smelting Co.*, 245 A.2d 436, 437 (Del. Super. Ct. 1968) (service directed to nonexistent company still adequate where defendant was aware of the action and able to appear).

[4]     I say nothing of the repeated factual misrepresentations to the Court, or the lack of due diligence.

With the benefit of those additional proceedings, I now hold that the judgment against NLRE is not void, that NLRE is properly viewed as a d/b/a name of Ribis, and that the judgment is effective to estop Ribis from relitigating the issues of breach and damages.

Ribis cannot dispute that the agreement was breached and that CDI is owed its $2.5 million deposit, pursuant to the agreement's liquidated damages clause. (PSTMF ¶ 1 (in describing the complaint against NLRE, explaining that it was "based on [NLRE's] failure to refund $2.5 million paid by CDI, in breach of the parties' agreements, after Ribis failed to acquire the Showboat Atlantic City Hotel and Casino"); DSTMF ¶ 1 ("Defendants do not dispute the allegations contained within Paragraph 1".); DS2TMF ¶¶ 7, 15).

Those undisputed facts are sufficient to estop Ribis from relitigating the breach and resulting damages, for which Ribis himself is *prima facie* liable. In the following section, I consider three defenses to personal liability which were not litigated in the prior proceedings.

### C. Ribis's personal liability on the NLRE contract

To defeat personal liability, Ribis asserts (1) the "de facto" corporation doctrine; (2) that he is a mere "promoter"; and (3) that there are material factual disputes about the manner in which the $2.5 million was spent, which would reduce the damages. I reject all three arguments.

#### 1. *De facto* incorporation of NLRE and NLRA

There is no dispute that Ribis signed the Term Sheet on behalf of the NLR LLCs. Since those LLCs did not exist at the time of signature, he is personally liable for a breach of that agreement. "A person is individually liable for contracts he signs under a nonexistent corporate name." *Fashion Brokerage Intern., LLC v. Jhung Yuro Intern., LLC*, 2011 WL 976478 at *4 (D.N.J. Mar. 14, 2011). That is because "a person conducting business on behalf of a nonexistent company holds himself out as an agent of a fictitious principal." *Id.*; *Lockwood Boat Works, Inc. v. Motor Vessel, A "1960" Flying Bridge Sportfish*, 2013 WL 5946544 at *1 n.1 (D.N.J. Nov. 6, 2013); *see also Gallant v. Fashion*

11

*Piece Dye Works*, 174 A. 248, 249 (N.J. Ch. Div. 1934) ("if there is no corporation [then the defendant] is personally liable for the debts created by him in the [corporation's] name"); *Fed. Advert. Corp. v. Hundertmark*, 160 A. 40, 40 (N.J. 1932) ("there w[as] no incorporation . . . . therefore, the defendants . . . were constituting themselves agents of a nonexisting principal, and became personally liable").

Having unsuccessfully claimed that *no one* is liable because the corporation(s) *did not* exist, Ribis now performs an about-face, and argues that *he* is not liable because the corporation(s) *did* exist. That is, Ribis argues that the NLR LLCs were *de facto* corporations, which shield him from personal liability in the same manner as an ordinary, legally established corporation.

This argument takes on slightly different contours as applied to each of the NLR LLCs. Though CDI sought previously to impose liability for breach of contract solely on NLRE (March 6, 2017 Op.), both NLRE and NLRA were parties to the binding Term Sheet agreement, (*see* DE 110-4 (agreement between CDI, NLRE, and NLRA, which was denoted as a "wholly owned subsidiary" of NLRE), and only NLRA was a party to the Licensing Agreement, (*see* 110-5.) NLRE was not incorporated at the time Ribis signed the Term Sheet and Licensing agreements on its behalf, and has not been incorporated since. Ribis claims, however, that NLRE was *de facto* incorporated at the time of the agreement.

NLRA, like NLRE, did not exist at the time of the Term Sheet or Licensing Agreements. (PSTMF ¶ 8; DSTMF ¶ 8.) It was, however, eventually incorporated on December 12, 2013, three months after the parties entered into the Licensing Agreement, and only one month before the NLR LLCs defaulted on the agreements. (DE 110-10; March 6, 2017 Op. at 4.) Ribis now argues that NLRA existed as a *de facto* LLC well before it became a *de jure* LLC.

12

I will assume *arguendo,* if *dubitante,* that the *de facto* incorporation doctrine retains its vitality in New Jersey.[5] In order to invoke the doctrine of *de facto* incorporation under New Jersey law, Ribis must show "(1) there is a law under which a corporation with the power assumed might be incorporated; (2) there has been a bona fide attempt to organize a corporation in the manner prescribed by the statute; and (3) there has been an actual exercise of corporate powers." *Pharm. Sales & Consulting Corp. v. JWS Delavau Co., Inc.*, 59 F. Supp. 2d 398, 402 (D.N.J. 1999) (*Delavau I*). Ribis bears the burden of

---

[5] The parties both note that the continued applicability of the doctrine of *de facto* incorporation is disputed in New Jersey. There is indeed some uncertainty as to the continued vitality of the doctrine, as state and federal courts in New Jersey have suggested it was abrogated by the passage of the New Jersey Business Corporation Act in 1968. *See Pharm. Sales & Consulting Corp. v. J.W.S. Delavau Co.*, 59 F. Supp. 2d 408, 414 (D.N.J. 1998 (*Delavau II*); *Trenton Dressed Poultry, Inc. v. Jamson*, 116 N.J. Super. 327, 328–29 (App. Div. 1971) ("Authority exists for the proposition that in the absence of the execution of the necessary certificate, there could be no de facto corporation"); *see also Thomson-CSF Components Corp. v. Hathaway Instruments, Inc.*, 85 F.R.D. 344, 348 (D.N.J. 1980).

I am not convinced, however, by the reasoning in these decisions. They rely on ambiguous passages in New Jersey statutes, *see* N.J.S.A. § 14A:2-7 (stating only that a corporation can be established by filing a certificate of incorporation), ambiguous Commissioner's Comments, *see Delavau II*, 59 F. Supp. 2d at 413 (noting Commissioner's Comment that N.J.S.A. § 14A:2-7 "virtually eliminates the distinction between *de jure* and *de facto* corporations" but which makes no reference to eliminating the *de facto* doctrine), and decisions in other jurisdictions which rely on provisions which far more clearly remove the *de facto* incorporation defense and which have no analogue among New Jersey's statutes, *see, e.g., American Vending Servs. v. Morse*, 881 P.2d 917, 920 (Utah 1994) (citing provision which holds that "[a]ll persons who assume to act as a corporation without authority to do so shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof"). I also note that a New Jersey Appellate Division case applied the doctrine after it was purportedly abrogated, *Cantor v. Sunshine Greenery, Inc.*, 398 A.2d 571 (App. Div. 1979) though no courts appear to have done so in the forty years following *Cantor*.

Other district courts after *Delavau II* have agreed that the precedent on this issue is mixed. *See Fashion Brokerage Intern.*, 2011 WL 976478 at *4 n.3 (D.N.J. Mar. 14, 2011). Since I conclude that the *de facto* doctrine does not apply to NLRE and NLRA in any event, it is not necessary to settle the legal status of the doctrine definitively.

establishing this defense. *Id.* at 402 (citing *Asplund v. Marjohn Corp.*, 168 A.2d 844, 849 (App. Div. 1961)). As for the first element, New Jersey obviously has a statutory regime for establishment of corporations and LLCs. *See, e.g.*, N.J. Stat. Ann. § 14A:2-7(2). As for the third element, it appears that NLRE and NLRA at least purportedly exerted their corporate powers by negotiating and entering into an agreement with CDI. *See Cantor v. Sunshine Greenery, Inc.*, 398 A.2d 571, 573 (App. Div. 1979) ("there was an actual exercise of the corporate powers by the negotiations with plaintiffs and the execution of the contract involved in this litigation").

The second element, a "bona fide" attempt to organize a corporation in the manner prescribed by the statute, is not met, however. That element requires some colorable, substantial (if imperfect) compliance with the statutory requirements. *Fashion Brokerage*, 2011 WL 976478 at *4. Courts may find this element satisfied, for example, when the purported corporation's representatives file a certificate of incorporation within a reasonable time after they entered into the agreement in the corporation's name. Thus, in *Cantor v. Sunshine Greenery, Inc.*, the organizers of a corporation signed a certificate of incorporation in compliance with New Jersey's statutory requirements and forwarded it to the New Jersey Secretary of State on December 3, 1974. 398 A.2d at 573. Thirteen days later, on December 16, 1974, they signed a lease agreement in the corporation's name. *Id.* Unbeknownst to the parties, however, the Secretary of State did not officially file the certificate of incorporation until December 18, 1974, two days after execution of the lease. *Id.* The Appellate Division refused "[t]o deny [corporate] existence because of a mere technicality caused by administrative delay," reasoning that to do so would "run[] counter to the purpose of the *de facto* concept." *Id.*; *Paragon Distributing Corp. v. Paragon Laboratories, Inc.*, 129 A. 404 (N.J. Ch. Div. 1925) (*de facto* incorporation where plaintiff attempted to file a certificate of incorporation prior to the date the contract was executed but did not take certain final steps until after the parties entered into a contract).

14

The facts of Ribis's case do not approach these. Ribis provides no evidence that he or his agents attempted to file such a certificate for either NLRA or NLRE at any time reasonably close to the date that he entered into the Term Sheet or Licensing agreements. Indeed, Ribis acknowledges that this did not occur, but blames his attorneys. He intended to incorporate the entities, he says, and he "understood that his attorneys at that time would handle the corporate formation," because he had "directed" them to do so. (Opp. at 3, 7; Ribis Dec. ¶ 11) He claims that he simply assumed the lawyers had carried out their duties to draft and file the relevant documents. (*Id.* ¶¶ 8–12.)

Whatever issues of fact this may raise are not genuine and material. The question is not whether Ribis thought his attorneys were taking care of registering his LLCs; that is a matter between himself and his attorneys, not between himself and CDI. Rather the issue is whether his attorney, as his agent, made a bona fide attempt to incorporate. *See Delavau I*, 59 F. Supp. 2d at 404 (concluding that "plaintiff, through its agent . . . did not make a bona fide attempt to incorporate"); *see also Conway v. Samet*, 300 N.Y.S.2d 243 (N.Y. Sup. Ct. 1969) (attorney's failure to file corporate certificate "evidence[s] a malpractice claim against the attorney involved, but do[es] not constitute a defense to the claims made against her in the present action"). It is undisputed that the attorneys, for whatever reason, did not make any such filing or attempted filing.

It is therefore not necessary to resolve factual issues regarding Ribis's instructions, if any, to his attorneys. The record is devoid of any facts suggesting that Ribis's attorneys made any attempt whatsoever to incorporate these entities prior to the date that the NLR LLCs entered the Term Sheet agreement, or within a reasonable time thereafter. *Delavau I*, 59 F. Supp. 2d at 404 (rejecting *de facto* incorporation where parties' agent admitted in his certificate that he prepared and mailed the certificate of incorporate just over a month after entering into the contract); *Asplund*, 168 A.2d at 849 (party

15

seeking corporate protection bears the burden of proving entitlement to *de facto* incorporation).

Ribis has failed to carry his burden of establishing a triable issue of fact as to the *de facto* incorporation defense.

### 2. Liability as "promoter"

NLRA was incorporated in December 2013, several months after the agreements were signed by Ribis. *See Delavau I*, supra (incorporation one month later not "prompt" for purposes of *de facto* incorporation). As a backup argument, however, Ribis asserts that he signed the agreements as a mere pre-incorporation "promoter" with respect to NLRA, and therefore should not be personally liable.

Ribis asserts that "[i]n New Jersey, a corporation is entitled to all the rights, and assumes full liability, under a pre-incorporation contract made by its agent ("promoter") on its behalf once it comes into existence." (Opp. at 9.) The implication is misleading. True, a corporation that comes into existence after a promoter has executed a contract on its behalf can "adopt a contract made for its benefit." *K & J Clayton Holding Corp. v. Keuffel & Esser Co.*, 113 N.J. Super. 50, 53 (App. Div. 1971). To do so does not affect or impair the rights of the other contracting party. That does not entail, however, that a person may sign a contract and then unilaterally relieve himself of liability to the other party by forming a corporation. "Whether or not the corporation were later to 'adopt' the contract, *a promoter could be held liable thereon.*" *Id.* (emphasis added). A switch could of course still be accomplished if the parties so agreed, as in many cases they may.

But unless CDI agreed to the contrary (and there is no evidence that it did), Ribis would still be liable on any pre-incorporation agreement he signed with CDI, even if the newly-formed NLRA later adopted the contract.

### 3. Damages

Ribis argues that he spent the "majority" of the $2.5 million he received from CDI on "operational or business related expenses." He details a number of business costs that ate up much of the $2.5 million. (Opp. at 11.) He then

claims this creates a material dispute of fact barring entry of summary judgment on the amount of damages. (*Id.*)

In my March 6, 2017 opinion and the accompanying judgment, I concluded that NLRE breached the contract and as a result owed $2.5 million, plus interest. This was not some calculation of outlays net of expenses. It was based on the contract's liquidated damages clause. (March 6, 2017 Op. at 4.) That sum represents, in substance, the return of CDI's initial deposit, which was agreed to be refundable in the event that Ribis failed to acquire the casino that was to engage CDI's online gambling services.

Liquidated damages are "the sum a party to a contract agrees to pay if he breaks some promise, and . . . is legally recoverably as agreed damages if the breach occurs." *Wasserman's v. Twp. of Middletown*, 137 N.J. 238, 248 (N.J. 1994) (quoting *Westmount Country Club v. Kameny*, 82 N.J. Super. 200, 205 (App. Div. 1964)). Such clauses "specify damages payable in the event of breach," *id.* and damages specified by the clause need only be "reasonably related to," not actually based upon, actual damages, *Metlife Capital Fin. Corp. v. Wash. Ave. Assocs. L.P.*, 159 N.J. 484, 493 (N.J. 1999). The measure of damages in this case, then, is set by the enforceable liquidated damages provision. *See Fashion Brokerage Intern., LLC v. Jhung Yuro Intern., LLC*, 2011 WL 976478 at *4 (D.N.J. Mar. 14, 2011) (liability on the contract). It is not affected by the manner in which Ribis spent the money he received from CDI in the hope of acquiring the casino. *Anderson*, 477 U.S. at 248 (facts are only "material" for purposes of a summary judgment motion if a dispute over them fact "might affect the outcome of the suit under the governing law").

I therefore reject this argument and hold the parties to the liquidated damages portion of the agreement.

### III. CONCLUSION

For the foregoing reasons, CDI's motion for summary judgment is **GRANTED**. An appropriate Order granting the motion follows.

Dated: November 9, 2020

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty
United States District Judge**